Case No. 245135, United States of America v. Courtland Reed Case No. 245526, United States of America v. Cedric Swannigan Argument to be 10 minutes for each defendant and 20 minutes for plaintiff Mr. Rossman for the appellant. Good morning. How are you? Good morning. I'm well. Thank you, Your Honor. May it please the Court, my name is Travis Rossman and I represent Appellant Courtland Reed. I would like to reserve two minutes for rebuttal. The first issue I would like to discuss today is the insufficiency of the evidence, starting with count four, which was possession with intent to distribute 50 grams or more of methamphetamine. No rational jury could have found Mr. Reed guilty beyond a reasonable doubt because Reed never gained possession over the methamphetamine in Toliver's car. You can have constructive possession, right? You can have constructive possession, but constructive possession has to be in the present. It cannot be in the future. If you are trying to get constructive possession of something or any kind of possession, it has to be now. The government did not charge Mr. Reed with intent. There was no instruction on intent. The government did not request one. So the theory here is that he actually or constructively possessed it when he got in the car. Now, the government argues that he constructively possessed it based on telling Toliver where to go and handing her the money. But there's a couple of problems with these theories. Handing her the money didn't create constructive possession because she didn't count it. And by her own testimony, she did not count it. And she said that she was not going to hand over the drugs until she verified that the money was correct. And by her own uncontradicted testimony, even when viewed in the light most favorable to the government, she said, I wasn't going to count it until I got to the hotel because I was too busy and I don't want to count money while I'm driving. And whenever you're driving drugs somewhere, you just want to get there and get it done to minimize the risk of being intercepted by the police. So she had not counted the money. She had not transferred possession. I mean, it seems really technical. Is there a case that supports this? I mean, it's like a non-pro-tunk. I mean, so what, it sprang back into constructive possession when she goes back to the hotel and counts the money? Well, I think our best case on this issue, and it was cited in the brief, is United States v. Quintanar. That's the Eighth Circuit case where the defendant there had the package delivered to someone's home. He knew it had drugs in it. He was trying to get it, but the recipient became suspicious. And so she took the package to the police. The police opened it and confirmed it had drugs. That seems quite a bit different than just counting to make sure it's a thousand bucks or whatever it was. Right. I think that it's not different because she could have backed out of the transaction at any point. She testified that the meth belonged to Swannigan and that it would continue to belong to him until they got to the hotel and she verified the money was right. So she could have backed out of the transaction at Swannigan's direction. She could have backed out of it because she just didn't want to. She could have four days later decided to see if it was counterfeit. So all that time it's still not constructive possession? I don't think so because he doesn't have the right to exercise control over it. He doesn't have the present right to do whatever he wants with it until they reach their destination and she verifies that the money is correct. It's like you're treating a drug transaction like this formal corporate takeover where there's lots of documentation and it only happens at this given minute. I think this would surprise a lot of people on the street that that's how this works. And I see that point, but I think really when you scrutinize Toliver's testimony, that's the way she looked at it. I mean she testified that she didn't know Reed. She had never met him. She didn't trust him. And so she wasn't going to transfer possession of something to someone that she didn't know, that she didn't trust. Let me ask you this. Does she have the right to cancel or rescind the transaction even if the amount of money was correct? There was no basis in the terms of the deal to do that, but people back out of transactions in the drug world for no reason at all. Or Swannigan could have called and said, hey, don't go through with it. I've got somebody that's willing to pay a better price. So at that point, I don't think Reed has the right to possess the drugs. He doesn't have control over them. He doesn't tell where they go. But he had relinquished the money is the problem. He didn't have his money anymore. Right. He handed over the money. She hadn't counted it yet and they were on the way. But the drugs remained in her pink bag with her license in it. They were on the way to this hotel and Reed walked away from the scene at the traffic stop. He didn't stay there. He didn't stick around. So he never gained the immediate right to possession and control of these drugs. He just didn't have it. And there are cases that talk about having drugs in the car, even with knowledge of it, that that's not sufficient to show possession. There are cases about possession has to be a present right. It can't be in the future. And without a charge for intent, the evidence was insufficient on that charge. Well, one of those cases is Arnold. That's an in-bank case, and I don't think the person had any idea. They were in the car. The drugs were in the car. They didn't know how many drugs were there. They still were stuck with all of them. Right. They're stuck to possession without their even knowing exactly how much. I think those cases kind of turn on whether the person did something to help with the drugs. So there was one case where the defendant distracted the police, and there was an obvious smell of marijuana in the car. So there's ways that a defendant can assert control or assert possession or aid in a bet without actually touching the drugs, but I would submit that that did not happen here. Count three charged Reed and Swannigan with conspiracy to possess with intent to distribute 50 grams or more of methamphetamine. And our argument is that the evidence was also insufficient on that count. Reed did not knowingly and voluntarily join the conspiracy because he never obtained possession of the methamphetamine. But I think more importantly, the conspiracy charge is really based on one transaction between Reed and Swannigan. There was no other controlled by. There was no search warrant at Reed's residence. There was no sort of follow-up. The pre-sentence report only assigned the methamphetamine from the car to Reed as relevant conduct because the government couldn't prove that there was any other quantity of methamphetamine that he was involved in. So at most, there's a one-time buyer-seller relationship here because one transaction does not indicate an agreement to join together in a broader criminal objective. I think that traditionally, the court has held that the presence of a third party could defeat the buyer-seller relationship argument. And in this case, we have Tolliver who showed up. And arguably, her presence could defeat that exception. But I think this case is different because Reed had no agreement with Tolliver. He didn't even know who she was. She just showed up. The government didn't argue that Tolliver disrupted the buyer-seller relationship. They relied heavily on the wiretap calls. So I think they've effectively abandoned that argument. And Tolliver was not specifically named in Count 3. And that, combined with the fact that the government didn't argue it, I think removes her from disrupting the buyer-seller relationship argument. There are some factors from the case law that talk about whether it's a buyer-seller relationship or a conspiracy. One thing I would just like to point out quickly because I see my time is expiring, if I may finish my sentence, is that Exhibit 3AM, which is the setup call between Swannigan and Reed for this deal, occurred on February 22nd, the same day as the deal, which was just a little advanced planning. Thank you. Good morning. Good morning, Your Honor. My name is Lori Riga. I'm here on behalf of Defendant Cedric Swannigan, and I'd like to reserve two minutes for rebuttal time. When Cedric Swannigan chose to exercise his right to a jury trial, he correctly understood that to mean that the jury and only the jury would perform the fact-finding function in his case. But here the district court erred when it allowed two case agents to testify about the meaning of wiretap calls between Defendant Swannigan, Co-Defendant Reed, and Nicole Tolliver that invaded that fact-finding function. This error, which the district court acknowledged, impacted the trial so much so that the government cannot meet its burden of showing there is a fair assurance that the error did not contribute to the verdict. So this court's seminal case on agents interpreting text messages and wiretap calls— Is this the water emoji point? No, Your Honor. That has to do with the motion to suppress. What's the evidence, the actual statements that were made that you're troubled by? The troubling statements come during trial in the testimony of, in particular, Detective Kristen Derrickson. So she testifies during trial that a few things— I mean, in terms of the fourth count in the indictment, in the second superseding indictment, that is the trafficking count. And the facts that comprise that count are a traffic stop that took place on February 22, 2022. And there, the theory of the case, Mr. Swannigan was not present at that traffic stop. So the government's theory is that Mr. Swannigan had constructive possession of those drugs, and it is primarily introduced through Detective Derrickson's testimony. She is held out as a primary agent. She's asked to page ID 2425. Is it fair to say you're one of the primary agents? She says yes. She's also held out as an expert in the field. The government goes over her testimony. What does she say that Detective Flurry doesn't say that's material? Well, what she says specifically, she addresses. Her testimony is really specific to that traffic stop because she was present at the traffic stop after it occurred. The substance of the testimony, just what did she say? Well, what she said basically is she interpreted a number of phone calls, intercepted phone calls. And what she says, and I'll give an example of one of the troubling phone calls. That's what Your Honor's questioning. If you look at page ID 2444, when the government plays Exhibit 3AQ, you see that she advances the government's theory of the case. So just very briefly, the theory of the case was that Mr. Swannigan constructively possessed the drugs and that because they were his drugs, he was frantically trying to get his vehicle back, the vehicle back, because he believed the drugs were still in the vehicle after the car was impounded. So when the government asked the agent at trial, what did this call mean? The agent responds that they were – this is the call between the co-defendants – that they were trying to get the vehicle off of the lot before what they believed at the time wasn't seized by law – that at the time wasn't seized by law enforcement. So she's referring to the drugs that Mr. Swannigan believes were seized out of the car. And so she's therefore advancing the theory of the case. But if you look at the call itself, it's in plain English. And this court's decision in United States v. Freeman, well, it held a number of things. One of the important things it held here is that a government agent cannot interpret for the jury. It cannot draw a conclusion for the jury of plain English language. Now, that case is also really important. Does Detective Flurry's testimony violate 701? It does, but I guess the focus of this particular claim is more so Detective Derrickson's testimony at trial. And in the Rule 33 motion, counsel did raise both of their testimony. The district court also raised both of their testimony in her Rule 33. But would it be harmless error if Flurry's testimony was not a violation of 701? Well, I don't think so, Your Honor, because – would it be harmless error in total? No, because really it's Detective Derrickson's testimony that establishes count four of the indictment, which is just the fact that that one traffic stop. You're saying Detective Flurry says zero on that point? He really doesn't discuss the traffic stop. He wasn't present. His testimony deals more with the general conspiracy and things that happen after that conspiracy. So what happened basically in Freeman that is particularly problematic here is that the Freeman court talks about the improper influence that's most acute when an agent testifies as both a fact and a lay witness, which is what happened here. She admits, Detective Derrickson says she's one of the case agents. She also defines terms on page ID 24 – or 2442. The government asks, What does a deuce mean? And she says it means two ounces. She's asked later, What does a whip mean? She says that means a vehicle. And if you look at her redirect testimony, it is replete with Detective Derrickson defining the different drug terms and different jargon of drug dealers. So the jury would have understood her as both a fact and an expert witness, and therefore there's this heightened fear of prejudice that the Freeman court enunciates. Am I right in thinking about these cases that there's not a very clear line about what you can and can't do? In other words, your example of deuce is two ounces. Forgive me, but I fear I've seen quite a few cases that would have said that's just fine. Well, the cases distinguish a lot. A lot of the cases that distinguish Freeman talk about when there's a lot of use of jargon, that it's okay, that the testimony's okay. In this case, and I hope I'm understanding Your Honor's question correctly, in this case she's held out really as both, and that's why it's particularly pernicious here. And Judge Larson notes that as well in her dissenting opinion in the recent United States v. Glenn case. She says in this case we have just an expert. We don't have an expert and a lay witness. And so there's no heightened sort of prejudice that would inure to the defendant. And I would argue here that it is not harmless error because the only other real testimony that establishes Mr. Swannigan's possession of the drugs or constructive possession of the drugs on that date is that of Nicole Tolliver, who has lied several times. She admits to lying on that day. Her credibility is severely undercut during trial. And I would ask also that this court review this under an abuse of discretion standard, not the plain error standard that the government asks, and use the Glenn court's analysis as guidance for that. The Glenn court, what it did below when the government similarly asked for a plain error review because it said the defense counsel did not state the nature of the objection, the Glenn court looked to how the district court responded. And similarly here, this court should look to how the district court responded to the defense counsel's objection. And if you look at page 2441, I see my time is ending, but the district court says at that page ID that you are translating, you need to stop translating. And also, Your Honor, if I can finish this thought, please. Briefly. Briefly. If you look at record ID 353, her Rule 33 opinion, she understands the objection to mean the entirety, the scope of the objection to mean the entirety of the line of questioning. Thank you, Your Honor. Thank you. All right. We'll hear Mr. Sewell, the government. Good morning. Good morning. Be grateful if you went at the issues they discussed, if you don't mind. You'll do. Okay. Madison Sewell for the United States, and may it please the court. So for the issues they discussed, this case involved lots and lots of code words, and this was in many ways standard, fair for a wiretap investigation involving drugs, and in this case methamphetamine. And there are at least four different witnesses, or five different witnesses, that interpreted those code words. Kirsten Dirickson, Ben Fleury, Cliff Simpson. Then you also have the two participants in the conspiracy, which were Nicole Tolliver and Bertie Phillips. How about just to zero in on, I thought the best point Ms. Riga made was that on count four, it sounds like only Detective Dirickson testified on that one, and that's the one that seemed to be the closest to a violation. Is it true that Detective Fleury did not also testify about the facts underlying count four? Ben Fleury did not testify about the specifics of the deal that went down on February 22nd. It's either a violation or it's, well, harmless, maybe plain error. Well, Nicole Tolliver did, and Nicole Tolliver was in the car, so there's ten calls that are played during Nicole Tolliver's testimony. And those ten calls, those are played during Nicole Tolliver's testimony. She's sitting in the car with Reed, listening to instructions from Swannigan. So there's ten calls from Nicole Tolliver. The thirteen calls from Dickerson, the first, I think, eleven or so are all on that day, the day of the traffic stop. And then the twelfth call is the day after the traffic stop where they're talking the aftermath. So most all of Dirickson's calls are there. The specific complaints about what did Dirickson get into in her testimony, and let's take 3AQ for an example. I mean, Dirickson basically restated what was stated on the recording. So it wasn't, in that instance, I mean, that's a harmless error, if anything, but it was just a restatement of it. She didn't interpret anything. On call 3AQ, on the call, you hear Reed is explaining to Swannigan what happened at the traffic stop. And Reed says she, referring to Tolliver, she kept telling him that, she kept telling them, the police, that she's having somebody go get the car. And Swannigan replies back, pick that motherfucker up. And so how does she translate that? If you consider the translation, she says they were trying to get the vehicle off the lot before what they believed at the time wasn't seized yet by law enforcement. That's a restatement of what was said on that. That's not, I don't view that as a translation. It's so much just a bland restatement of what was said on the call. And in any case, Nicole Tolliver is there in the car experiencing all the same things, and she testifies in detail about how that interaction was set up, how it was orchestrated, how it was planned. They also admitted not just the ten phone calls through Tolliver's testimony, but also the text messages back and forth, working out that deal and how much money to give to give the money to Reed, etc. What's your response to the constructive possession point with respect to Reed? The constructive possession point with respect to Reed. So on that, I think, so a number of things. Think about if Tolliver had walked away. Reed had just handed her a stack of money, $3,000. And so had Tolliver walked away, surely Reed would have immediately said, you can't walk away. I've paid for my drugs. Those are mine now. And so Tolliver can't walk away. He's going to assert his possession at that point. So at that point, once he pays the money, and especially viewing it in the light most favorable to the United States, and looking at what the jury – what the evidence the jury saw, there is no evidence that Reed did not believe that he had the ability to exercise control over that and plan to do so in the future. And so also what if the – I mean consider – defense counsel said, well, what about if the money wasn't right? Well, what about if the amount of drugs wasn't right? What if there were too many drugs there? Are we going to reconsider that and that he only constructively possessed the exact amount that he paid for? That's not really clear. And so also the jury saw from the evidence that both Tolliver and Reed are going to do what Swannigan says. I mean Swannigan is calling the shots. Reed – they have that conversation, which is 3 a.m., which is the first call where Reed and Swannigan are discussing, the call where Reed says, I'm trying to get your bread straight, trying to make sure that I have the amount of money. Reed doesn't have all the money that Swannigan wants him to have. And so it's clear listening to 3 a.m. that Reed is still going to have to come up with more money on that. And Swannigan says, well, you can keep $100 for the hotel, but I need the rest of it. And so then Reed gives Swannigan that money. So he still owes Swannigan money. If there's any deficiency, they have an ongoing relationship. And Ben Fleury helps detail the other calls where Reed is delivering methamphetamine for Swannigan. So even if there was a dispute, they would be able to resolve that out. It's clear from listening to 3 a.m. that Reed is – it's not a one-time transaction. Reed has an ongoing transaction. He's going to have to pay more money at that point. He wants $100 so he can get the hotel room, so that will help him go presumably sell the pound and a half of methamphetamine. Then – so that was the main issue on the constructive possession. I think you've responded to both of their arguments, best I can tell. I have – I wanted to note one typo in my brief. On page 33, line 3, I cite to a quote, and I say exhibit 3BQ, and that should be 3BP. And if the court has no further questions. I don't think so. Thank you very much. Thank you. We appreciate it. I hear both of you have two minutes to rebuttal. Mr. Rossman? Thank you, Your Honor. The government talked about what would have happened if the amount of drugs wasn't right. But I think that's speculative, and speculation – But why isn't it quite identical in both directions? One, not the right amount of money. One, not the right amount of drugs. Everyone's still assuming you're moving forward. Well, I think that actually helps my case because just as Tolliver had not counted the money to verify that that was correct, Reed had not weighed the drugs or verified that the amount of the drugs was correct. So to use a bad analogy, the contract is still executory. There's still performance on both sides that has to happen. We're back to the corporate transaction. Right. It's a bad analogy, but it's the best I've got. But I think the government said here that he planned to do so in the future regarding possession, and that's the essence of the argument. He planned to do so in the future, charge him with attempt. Was it a substantial step? Let the jury decide. They didn't do that. They proceeded on a present possession theory. They had the wrong theory for their facts, and that's why the evidence is insufficient on that count. The government talked about Reed couldn't have walked away without the drugs once he paid, but he did. Now, granted, it was due to police intervention, but he walked away from the scene and left the drugs behind. He didn't try to take it with him. He didn't try to take the bag. So he actually did that. Talking about Reed coming up with more money, Reed still owes money on that. I think, again, that shows that the deal is not complete and that there is not a finished transaction here, and he doesn't have a right to present possession. And what I didn't hear I think is even more important on the conspiracy count. I didn't hear that Tolliver disrupts the buyer-seller defense, and I think that's an extremely important point. I think that that's a theory they could have asserted. They've abandoned it, and so I think that shows that the evidence is insufficient on the conspiracy count. Thank you. Thank you. Ms. Riga. Your Honor, I think it's important to note that under the Freeman analysis, the harmlessness analysis involves the government. It is the government's burden to demonstrate that the introduction of improper testimony was harmless beyond a reasonable doubt. On that count, Tolliver, he said 10 calls were introduced into evidence? Yes, Your Honor. There were calls. There were a number of calls. I would point to the court's attention that in Glenn also, in United States v. Glenn, there were many text messages exchanged between the decedent and the defendant, but it was really two that the court focused on that interpreted that the court found problematic, so much so that it was beyond a reasonable doubt that the court didn't have a fair assurance that those improper calls or text messages did not contribute to the verdict. So if you look at what's left here, if you take out Detective Derrickson's testimony, what you have left is Nicole Tolliver, who is a drug addict, admittedly. If you look at page ID 2467, you can see in Detective Derrickson's cross-examination testimony that the defense counsel adeptly raised all of the lies that she told both during the course of the investigation, once she had been apprehended, on the night of the apprehension, on the night of February 22nd, but also the lies that she told about other drugs that were supposed to be available in a different county in Kentucky. And so her credibility is severely undercut by cross-examination, and the government therefore cannot meet its burden of showing count four, Mr. Swannigan's constructive possession under count four. For that reason, Your Honor, I would ask that the court vacate Mr. Swannigan's convictions and sentence and remand this case to the district court. Thank you. Thanks very much to all three of you for your helpful briefs and arguments. Mr. Rossman, I see your court-appointed counsel, for which we're very grateful, and you're certainly not fully compensated for that work. Come to think of it, almost no one in this room is being compensated presently, so thanks to all of you for working on, well, speaking of transactions, with the assumption you'll be paid eventually. So forgive us. On behalf of the federal government, the case will be submitted.